**From:**      james3 encinas
**To:**        Office 5151
**Subject:**   [EXTERNAL] Fw: RACIAL HARM & FRAUD @ UW Medicine/HARBORVIEW
**Date:**      Friday, December 17, 2021 10:56:42 AM

---

**Caution! This email originated outside of FedEx. Please do not open attachments or click links from an unknown or suspicious origin.**

Sent from Yahoo Mail on Android

FILED (DROP BOX)

DEC 17 2021

----- Forwarded Message -----
**From:** "james3 encinas" <j_encinas@yahoo.com>
**To:** "University of Washington" <uwpres@uw.edu>, "goodmw2@uw.edu" <goodmw2@uw.edu>, "jfreeman@kbmlawyers.com" "jfreeman@kbmlawyers.com"

CLERK U.S. DISTRICT COURT AT SEATTLE
WESTERN DISTRICT OF WASHINGTON
BY _____ DEPUTY

**Sent:** Fri, Dec 17, 2021 at 10:08 AM
**Subject:** RACIAL HARM & FRAUD @ UW Medicine/HARBORVIEW

Dear President Ana Cauce,
I write to you know in hopes of working together to find a suitable resolution to my current claim
ENCINAS VS UW/HARBORVIEW 2:20-cv-01679.
The email attached below from William Goodman, UW/RISK MANAGEMENT to Kristi Dore on 11/21/2021 indicates he is attempting to resolve this matter which I am willing to do.
I welcome your guidance on next steps.

James Encinas





**W** CLAIM SERVICES
UNIVERSITY of WASHINGTON
Risk Services

**PRIVILEGED AND CONFIDENTIAL**

November 19, 2021

Kristi Dore
Mental Health Practitioner
HMC

Delivered via email klebow@uw.edu

RE:    Tort claim filed by James Encinas

Dear Ms. Dore,

This letter will confirm notice of a claim filed by Mr. Encinas and serve as notice to hold all potentially related documents and communications should litigation ensue from the claim.

I am the Claim Specialist at the University of Washington in Risk Services assigned to investigate and resolve Mr. Encina's claim on behalf of the University. Risk Services is separate from the Attorney General's Office. Once a verbal or written demand for monetary damages is presented by the claimant or the claimant's representative or attorney, the matter is referred to our office for management and/or possible resolution.

From the facts as I understand them to date, you may be aware of Mr. Encina's claim. As a result, I foresee that your participation and cooperation at various phases in this case will be essential.

Because this case may proceed to litigation, it is important that all potentially relevant documents in your possession and in the possession of the University be retained. In addition, if you are aware of other documents that may be relevant but which you do not currently have access to,



10:00

5G

**LH Encinas- Dore**
DOC - 200 KB

7:02 PM

that all potentially relevant documents in your possession and in the possession of the University be retained. In addition, if you are aware of other documents that may be relevant but which you do not currently have access to, please so inform me. DO NOT DESTROY, DELETE OR DAMAGE ANY DOCUMENTS THAT MAY RELATE IN ANY WAY TO THE CLAIM. In addition, please suspend any scheduled destruction, archiving, or deletion of documents related to this matter until you specifically have been advised that you are authorized to do so. Failure to comply with any of the above could result in penalties imposed upon the University and/or you by a court.

Please start a separate confidential file for all notes and correspondence relating to this matter, including documentation of any steps taken to preserve relevant documents. I may need complete copies of all documents that could reasonably relate to this situation. These documents may reside in your office, your home, or may be held in the University Records Center and/or University Archives, or other places. "Document" is broadly and generally defined by courts as including, among other things, writings, drawings, graphics, charts, photographs, phone records, images, e-mails, voicemails, all electronically-stored information, and any other data compilations from which information can be obtained. You should retain the original documents in your office and on your phone or computer hard drive, if applicable. Before copying electronic documents, you should first preserve them by creating electronic folders and transferring all related emails to those folders. You should retain the original paper documents in your office or, if electronic, on the electronic source from which they are generated.

This direction for document retention is sometimes referred to as a "litigation hold". There are documents available which provide additional background and information on



which provide additional background and
"litigation holds" that may be helpful to you. One that may be
useful is: "The UW Guidelines on Electronic Discovery".
All documents are available on the Attorney General's
Office                website                at
http://www.washington.edu/admin/ago/links.html.

**Open Office**

III    O    <

10:00                                    5G

---

VZW Wi-Fi                7:03 PM

**LH Encinas- Dore**
DOC - 200 KB

"litigation holds" that may be helpful to you. One that may
useful is: "The UW Guidelines on Electronic Discovery".
All documents are available on the Attorney General's
Office                website                at
http://www.washington.edu/admin/ago/links.html.

You should not discuss or share the details of the
circumstances around this claim with anyone other than our
office, the University's Assistant Attorneys General, and/or
your spouse or registered domestic partner. The reason for
this request is that other conversations are not legally

privileged and may jeopardize the defense of this case should litigation ensue.

Once the investigation is complete, our office will then make a decision as to whether to deny the claim or attempt settlement. Our settlements are usually mutually confidential, so you may not be told all the terms of the settlement. Please feel free to call me at any time to get an update on this claim.

If you have any questions or concerns regarding this letter or our conversation, please do not hesitate to contact me. I look forward to working with you on this case.

Sincerely,

William Goodman, Claim Specialist
Claim Services
206 616 7510
goodmw2@uw.edu

Enclosure: *What is a claim?*

## WHAT IS A CLAIM?  WHAT IS A LAWSUIT?

A claim is a written demand for compensation based on alleged negligence. A claim can be presented by a claimant or the claimant's representative or attorney. The claim is not filed with the court so is not subject to court rules or scheduling. Claims are managed by Claim Services in Risk Services, and defense attorneys are not typically retained.

Open Office



Encinas complaint
PDF - 502 KB

## IV. EXHAUSTION OF FEDERAL ADMINISTRATIVE REMEDIES

A. It is my best recollection that I filed a charge with the Equal Employment Opportunity Commission or my Equal Employment Opportunity counselor regarding the defendant's alleged discriminatory conduct on *(date)*

On or About 6-25-19

B. The Equal Employment Opportunity Commission *(check one)*:

- ☐ has not issued a Notice of Right to Sue letter.
- ☒ issued a Notice of Right to Sue letter, which I received on *(date)* 8-17-20

*(Note: Attach a copy of the Notice of Right to Sue letter from the Equal Employment Opportunity Commission to this complaint.)*

C. Only litigants alleging age discrimination must answer this question.

Since filing my charge of age discrimination with the Equal Employment Opportunity Commission regarding the defendant's alleged discriminatory conduct *(check one)*:

- ☐ 60 days or more have elapsed.
- ☐ less than 60 days have elapsed.

## V. RELIEF

*State briefly and precisely what damages or other relief the plaintiff asks the court to order. Do not make legal arguments. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.*

LOSS OF WAGES $50,066 DUE TO WRONGFUL TERMINATION
PUNITIVE $5 MILLION DUE TO RACIAL DISCRIMINATION
PAIN & SUFFERING DUE TO RACIAL DISCRIMINATION

"PLEASE HELP ME "
"WHY WON'T THE MEDIA TELL MY STORY"...
"WILL NOBODY HOLD THESE PEOPLE ACCOUNTABLE"...
"THEY ARE ECONOMICALLY KILLING US ON THE JOB JUST LIKE THEIR
KILLING US IN THE STREETS"...

10:49   5G

✕  🔒 Former UW Medicine e...   🔖 ⤴ ⋮
From seattleonlinenews.net – del



**SEATTLE NEWS**

# Former UW Medicine employee was racially bullied and retaliated against by peers, supervisors, human resources.



From the beginning, James Encinas felt that he was hired as a minority "token" when he joined Harborview Medical Center as a peer support specialist.

As a former addict himself, James could...

|||   ◯   ‹

!Former UW Medicine peer support specialist James Encinas sitting in his home. PHOTO & STORY BY CAMERON SHEPPARD

FORMER UW MEDICINE EMPLOYEE WAS RACIALLY BULLIED AND
RETALIATED AGAINST BY PEERS, SUPERVISORS AND HUMAN RESOURCES

James Encinas worked for the HARPS behavioral health program that aimed to house the
chronically homeless.•

"THIS IS A TRUE STORY"...
"THESE EVENTS REALLY HAPPENED"...
"NO NAMES HAVE BEEN CHANGED TO PROTECT THE GUILTY "...
By James Encinas

"I WANT TO BE VERY CLEAR ABOUT THIS, THIS STORY IS NOT ABOUT THE
GOOD WHITE PEOPLE, THE GOOD BLACK PEOPLE, THE GOOD NATIVE
PEOPLE, THE GOOD LATINO PEOPLE, THE GOOD MUSLIM PEOPLE, THE GOOD
VIETNAMESE PEOPLE, THE GOOD POLICE, THE GOOD DOCTORS AND
FRONTLINE PEOPLE AT UW MEDICINE/HARBORVIEW HOSPITAL YOU KNOW
WHAT I'M SAYIN, IT'S REALLY NOT. THIS STORY IS ABOUT PEOPLE
CHOOSING TO HARM PEOPLE, PLAIN & SIMPLE"...
LET ME BE CLEAR ABOUT THIS FACT TOO, I STILL ABSOLUTELY BELIEVE IN
THE UNIVERSITY OF WASHINGTON/HARBORVIEW AND ALL THE GOOD
PEOPLE I JUST MENTIONED, BECAUSE WITHOUT THEM I WOULDN'T BE
ALIVE TODAY YOU KNOW WHAT I'M SAYIN, I WOULD NOT BE CLEAN AND
SOBER TODAY. HARBORVIEW SAVED MY LIFE AND NOTHING THAT THE
BAD PEOPLE DID TO ME THERE CAN EVER TAKE THAT FROM ME, NOR CAN
THEY TAKE IT FROM THE GOOD PEOPLE THERE WHO DEDICATED THEIR
LIVES TO HELP ME AND SO MANY OTHERS. SO TO YOU PEOPLE, THANK
YOU"..."THIS STORY IS ABOUT THE PEOPLE WHO HARMED ME YOU KNOW
WHAT I'M SAYIN AND I TELL MY STORY SO OTHERS WHO HAVE BEEN
HARMED WILL KNOW THAT THEY ARE NOT ALONE. I TELL MY STORY TO
SPEAK UP FOR THE VOICELESS"...
By James Encinas

"AND FOR THE RECORD, THE ONLY PEOPLE SCARED OF THIS STORY ARE
THE ONES THAT DID IT"...
By James Encinas

From the beginning, James Encinas felt that he was hired as a minority "token when he
joined Harborview Medical Center as a peer support specialist.
As a former addict himself, James could relate with and provide mentorship to the clients
he helped get clean and off the streets. He has been sober for nearly two decades after
suffering from substance abuse issues for more than 40 years of his life. He is a survivor of
violence and abuse through both his juvenile and adult life."I survived the very same
trauma that they were going through," he said. James found himself in and out of
incarceration throughout his life, stemming from his chemical dependency and other risky
behaviors.!It was not until he watched a man get killed while incarcerated that he decided
to get himself sober. It terrified him to see what could happen to someone caught up in the
very system and environment he was in. It was behavioral health programs like
Harborview's Housing And Recovery Through Peer Services (HARPS) that helped James
get himself sober and in a position to help others that were struggling like he had been. He
would credit the help and support he received from a behavioral health specialist and a

Seattle Police Officer that helped him make a new life for himself. He liked his job as a peer support specialist because he could help people and he was good at it. He helped many people get put into housing through the HARPS program, exceeding expectations. In less than a year he was able to help nearly 30 formerly homeless individuals become self-sufficient to the point where they could pay their own rent. He would be given an award from Harborview Medical Center recognizing his service. Former clients wrote notes to James after they became self-dependent, thanking James for his support, and even crediting him with saving their life at times. However, James' success would be forgotten by the program and the institution which hosted it. He would be alienated, bullied and gaslighted before an effort made to get rid of him, rising all the way to the human resource representatives and program administrators, would prove successful.

USING THE PROTECTIVE RESOURCES AVAILABLE TO HIM

There were instances in which James said he felt racially discriminated against and even bullied on the job, not by one single individual, but by many. This includes his supervisors, his peers and health care professionals he worked closely with as he and the HARPS team pushed to get homeless individuals into safe housing. When James experienced these workplace transgressions, James used the resources and systems that were available to him and that were intended to protect all employees equally under the rule of law and in good faith.

Numerous reports were made by James and complaints were filed over multiple years. The complaints were often forgotten, seemingly ignored. Even when other coworkers noticed instances of racist micro-agressions, sexual harassment, hostile work environments, even workplace assault, it seemed like accountability was never upheld.The complaints that James made stacked up over time. Many of them went unaddressed for months at a time. A lot of them went unacknowledged until James was being fired for reasons that simply did not add up. However, James never stopped documenting his complaints, the conversations he had to follow-up on those complaints, the things he was told in response. When it felt like an office or representative was not upholding proper accountability, he moved on to the next step of reporting. Performing with great diligence and trust in systems that seemed to produce no results or accountability. As someone who had been victimized, James does not think of himself as a victim, but rather a "victor." He is strong in his will and in his moral compass and he refused to be rolled over by individuals or the systems they were a part of. "When I got my voice back, I was focused on one thing," James said, "NEVER BEING LIED TO AGAIN BECAUSE THE LIES HURT MORE THAN THE ABUSE." James knows what it is like to be gaslighted and invalidated after blowing the whistle. As a young victim of abuse he had been made to feel like a liar when he called for help. He said he understands that the effort to invalidate and gaslight victims only serves to keep the status quo of the system and to maintain the complicity of the individuals within it. It is a technique under which accountability can not be withheld. Partly because he was familiar with this idea and that he had experienced this dynamic many times before, he kept careful records of the complaints he filed, the responses he received, the retaliatory communications he garnered, and the attempts to invalidate his experience and tarnish his character in this new workplace.
His hope was that this would protect him and that accountability would be had. Unfortunately, this was not the case.

PATTERN OF BULLYING AND RACIAL DISCRIMINATION

Initially, James often had issues with the HARPS Program Coordinator, Lisa Lovejoy. Just before June 2018, James filed a complaint with the HR Department at Harborview Medical Center – University of
Washington alleging a pattern of inappropriate behavior and conduct by Lovejoy and a few other employees, including his supervisor. James wrote in his complaint that a few days before, Lovejoy cornered him and demanded that they speak about a union-related dispute. James wrote that he expressed to her that it was not the right time or place to speak about union matters. According to the complaint, she continued to berate him about this dispute and physically cornered him and blocked his path when he tried to leave. Eventually she said "SHUT YOUR MOUTH JAMES," and when James said she had no right to say that, she told him that "SHE DID HAVE THE RIGHT TO TELL HIM TO SHUT UP." In the same complaint James alleged that Lovejoy regularly made comments like "WHY DO YOU EVEN WORK HERE JAMES" or "THIS IS THE HARBORVIEW WAY JAMES AND IF YOU DON'T LIKE HOW THINGS ARE DONE HERE MAYBE YOU SHOULD FIND ANOTHER JOB". James also claimed that Lovejoy had been interfering with his professional relationships with housing providers which the program and James worked closely with to get people into shelter. He wrote that she had personally damaged not only the client's relationship with him, but also with the program. James said that a particular client questioned whether to continue working with the program because the interaction she had with "LOVEJOY MADE HER FEEL ATTACKED."He also wrote in the HR complaint that both Lovejoy and their supervisor, Martha Linder, witnessed an employee named "CLARA EVANS CALL JAMES A MONKEY," a term that James reasonably interpreted as a racial slur. The complaint states that neither Lovejoy or Linder reported the instance to HR, nor did they even acknowledge the interaction. James and his supervisor, Linder also witnesses Lovejoy grabbing the arm of Evans during a verbally aggressive workplace altercation. James wrote to the HR department via email about this incident expressing that the work environment felt unsafe. At this point James has witnessed and reported two incidents involving Lovejoy's inappropriate and aggressive workplace behavior. Linder was aware of both of these incidents.
In November of that year, Lindner, who was not a Human Resources Consultant, wrote to Clara Evans, the victim of Lovejoy's assault, explaining that the investigation of Lovejoy's actions had been closed, stating, "I WAS ABLE TO SUBSTANTIATE YOUR CONCERNS ABOUT THE VERBAL TONE WITH WHICH YOU WERE APPROACHED. I WAS ALSO ABLE TO SUBSTANTIATE THAT YOU WERE STOPPED AND YOUR ARM WAS HELD AS YOU ATTEMPTED TO LEAVE YOUR WORK AREA, THOUGH I WAS UNABLE TO SUBSTANTIATE YOUR CLAIM OF BEING HELD FORCEFULLY IN A PROLONGED MANNER," wrote Lindner to Evans on Nov. 8, 2018

James felt that the HR department had not thoroughly investigated either of his claims against Lovejoy and that she was being protected not only by the HR department, but by the supervisors and administrators of the program. Lovejoy is somewhat of a public face for the University of Washington's mental health programs. Her picture and story is featured on their website and James said her face was even posted on the outside of a building wall on the campus. James began to notice a pattern of his reports to Human Resources and his supervisors being ignored, and "THE INVESTIGATION OF HIS CLAIMS BEING LESS THAN TRANSPARENT" and stretched out over long periods of time with little updates given to him. In direct contrast, there were complaints against James filed by some of the same coworkers he had filed complaints against in which they were "INVESTIGATED IN A MATTER OF WEEKS". James felt this was not only unfair,

but a form of retaliation against him for blowing the whistle on his co-workers.

On June 3, 2019, Senior Human Resources Consultant, Nola Balch, emailed James regarding his complaints from over a year ago. "SHE SAID THAT SHE HAD FINDINGS THAT A NUMBER OF JAMES' CONCERNS WERE VALID". She also "ADMITTED IN  WRITING" that she determined "HARBORVIEW MENTAL HEALTH SERVICES LEADERSHIP DOES NOT CONSISTENTLY AND  EFFECTIVELY  FOLLOW  UP ON EMPLOYEE COMPLAINTS/CONCERNS AND THAT HUMAN RESOURCES DID NOT ENSURE EFFECTIVE COMMUNICATION/GUIDANCE ON SOME PROCESS MATTERS". James wrote back to Balch the next day, asking why his initial complaint about Lovejoy took over 6 months to investigate and warranted an outcome that did not prevent her from assaulting Clara Evans in a similar way. He also asked why a complaint filed against him was investigated to completion in less than 30 days. "I HAVE BEYOND QUESTION BEEN HARMED BY MY CO-WORKERS, THEN FURTHER HARMED BY THE PROCESS THAT IS SUPPOSED TO PROTECT ME" without fear of reprisal, reprimand or retaliation, James wrote to Balch.

Within the next few months, it seemed that retaliation is exactly what James should have feared.

FEDERAL DISCRIMINATION COMPLAINT AND RESPONSE

On June 27, 2019, James took his complaints of racial discrimination, a hostile work envirnment and retaliation to the Equal Employment Opportunity Commission, the federal office established to protect employees from unfair and illicit discrimination. "FEDERAL EEOC INVESTIGATOR ELIZABETH KIDD RULED THAT SHE COULD NOT FIND ANY PROOF THAT JAMES WAS RACIALLY HARMED".

A representative from his employer's complaint investigation and resolution office wrote the EEOC back, denying all of James' allegations – making him feel that he was being gaslighted by calling him "unreasonable," "unprofessional" and "insubordinate." The Title IX investigator for the University Complaint Investigation and Resolution Office, Kati Lappi, wrote on August 19, 2019, the results of her investigation and response to James' Federal EEOC complaint. She denied every single allegation James made in the EEOC complaint, of which there were almost a dozen transgressions over multiple years. "SHE OUTRIGHT DENIED CLAIMS THAT RACIST COMMENTS WERE MADE IN THE WORKPLACE, EVEN WHEN MULTIPLE EMPLOYEES HAD CORROBORATED THAT THEY WERE MADE". When supervisors and medical professionals admitted to making off-color comments or unprofessional behavior Lappi wrote about it in a way that minimized its impact. Lappi's responding document to the EEOC complaint references James' past infractions as a way to discredit him and even "REFERS TO HIS PHYSICAL  WEIGHT AND SIZE AS A WAY TO JUSTIFY  AN EMPLOYEE'S FEAR OF HIM".

The people who were responsible for investigating James' work place complaints claimed they did so, they claimed witnesses and parties involved were interviewed, but James says he was never a part of those conversations despite being the victim. Less than five months after James filed his EEOC complaint against his employer, he was fired for reasons that seemed to be less than concrete, inconsistent and often intangible.

When James was fired and could not receive unemployment benefits, he appealed his former employer's right to deny him benefits for violating company employment terms and policies. After his hearing with the Employment Security Department, it was determined that "JAMES DID NOT VIOLATE COMPANY POLICY" and that "HE WAS TERMINATED FOR A FACEBOOK PHOTO HE POSTED OUT OF THE

WORKPLACE" without being asked about the intent of his action. "HIS EMPLOYER DID NOT SHOW UP TO THE ESD HEARING" despite having ample notice. The ESD Administrative Law Judge, Dan Gerard, determined that James' employer did not fulfill the burden of proof the law requires to establish that James willfully or wantonly disregarded employer's rights, title or interests, or those of his co-workers. Essentially meaning that "THE COURT DID NOT AGREE WITH THE REASON THAT JAMES WAS FIRED".

RETALIATION AND COLLUSION AGAINST JAMES

On August 8, 2019 James received a formal notice from Jerome Dayao, chief nursing officer of HMC patient care services, notifying him that he was being placed on immediate leave pending the investigation into a report of unprofessional and intimidating behavior. A few instances are cited for the reason of placing James on leave, none of the alleged "TRANSGRESSIONS AS EGREGIOUS AS THE REPORTED PHYSICAL ALTERCATIONS PERFORMED BY LOVEJOY".
The report that was put together about James' transgressions was complete by the end of August. Multiple times the report, written by HR consultant Nola Balch, mentioned "NON-VERBAL COMMUNICATION MADE BY JAMES", mostly "EYE-CONTACT" that was described as "SCOWLING," "GLARING," "STARE-DOWNS," and "DIRTY-LOOKS."It is worth noting that James has a noticeable injury to his left eye and It is unclear if the appearance of his eye played a role in how his glances were perceived, but compared to Lovejoy's actions or that of white staff member "ROY SCHICK WHO SEXUALLY ASSAULTED A STUDENT ON CAMPUS TO-WHICH HE WAS NEVER PLACED ON PAID LEAVE OR FIRED", its clear in these documents and emails, James, a black staff was treated differently and more harshly then white staff. James' report described the interpretation of his looks as "DIRTY-LOOKS WITH AN INTENT TO ANTAGONIZE/COMMUNICATE MALICIOUSNESS". It claimed that these "NON-VERBAL COMMUNICATIONS" had occurred over a period of months but cited in-detail one very specific example involving a coworker named Adrienne Tillery. The report indicates that this event happened on August 7, one day before James was notified that he was being placed on administrative leave. The report described the incident to James like this...You walked past at the end of the hallway towards the outside/drop-in. It is reported that upon seeing Ms. Tillery, you slowed down significantly, caught her eye and looked her up and down slowly, twice, with a scowling/angry look on your face you held her eyes as you moved away down the hallway. What is notable about this report is the unique detail of how it is described in this document. The detailed account of the "dirty look," comes in stark contrast to how other events and allegations are investigated and described in other documents James received from Human Resources, administrators and his supervisors concerning complaints he filed. Even when James reported incidents of racial slurs being used against him and others and workplace violence, his account of those incidents, or any detailed account of those incidents rarely show up on the documents. When those investigations are complete, the reports often avoids the details of the specific harmful language used or in the claims against Lovejoy, they do not admit that violence occurred or that a verbal assault occurred. "THE CLAIMS AGAINST LOVEJOY, SUBSTANTIATED BY MULTIPLE EMPLOYEES CERTAINLY SEEM TO BE UNPROFESSIONAL AND INTIMIDATING" yet "JAMES IS PUNISHED FOR PERCEIVED GLARING, SCOWLING AND DIRTY-LOOKS".
One of the last things referenced in this document involves a photo that was taken of James and two of his more supportive co-workers and was posted after work hours on James

personal Facebook account.

The intent of this post was misinterpreted, possibly deliberately, and a narrative was fabricated against James by some of his coworkers, including "SUNNY LOVIN, WHO RECIEVED THE INITIAL PHONE CALL ABOUT THIS LIE AND SENT THIS LIE TO HUMAN RESOURCES".

The lie that was created was that James sent his coworkers the Facebook post as a way to intimidate them. Phone records that James obtained proved that he never sent the Facebook post to any of his coworkers, and they instead shared the Facebook post among themselves.The Facebook post in question was one that was made on August 9th, one day after James was placed on administrative leave. It was a Friday, the end of the work week.The post was a picture of James and two of his more supportive coworkers Kristi Dore and another, posing together after a lunch they had together. Both of these coworkers had also filed complaints or reports against both supervisors and peers discriminating or bullying James.The caption on the post read: '"HOW YOU LIKE ME NOW"…"WHILE YOU BUSY BULLSHITIN"…"WE GONNA SEE WHO'S THE LAST ONE STANDING"…"AND WHO'S SHIT YOU STANDIN IN"…"CAN YOU SEE ME NOW"…'James claims the caption was a reference to his rocky relationship with his wife. They were in the middle of separating at the time. He feared she was relapsing into a life of addiction, one that if he joined her in, he knew he would not survive. So he had no choice but to push her out of his life to maintain the sobriety that he had worked so hard to keep. One of James' coworkers named, Kevin Cormier, stated that he was sent this post via text message directly from James as a way to intimidate him, despite phone records that indicate that this was not true. "SEVERAL OTHER EMPLOYEES, LIKE SHERRONDA JAMEMISON CORROBORATED THIS LIE, INCLUDING ROBBIE FLANNIGAN", Lisa Lovejoy's partner.

In an interesting contrast to the speed in which Human Resources had typically investigated complaints and allegations, by the end of the same day in which the allegation was made by Cormier and others, HR consultants had already discussed notifying James that he had violated the terms of his leave via email.The discussions of James' termination continued into Friday evening and even into Saturday.

The investigation into the validity of the allegations was done hastily, without substantial evidence that James had directly sent the post to any of his coworkers.When Cormier and others were asked by HR consultants for the actual texts that James allegedly sent to them, Cormier and others claimed they had deleted the texts in question. Multiple human resource consultants and supervisors corresponded throughout the day on Saturday, August 10. Despite a shaky and changing story from the accusers, they continued to pursue an avenue which they expected would lead to James' termination. James was able to produce phone records proving that he had no text message correspondence with Kevin Cormier on the day he alleged. Kevin Cormier left his position around the same time, the reason for his departure was unclear and it was not known if he was fired or he resigned, according to multiple HARPS employees.

James was told in September 2019 that he could return to work under the conditions of a final action plan. He returned to work in October 2019.On November 21, 2019, HARPS supervisor, Martha Lindner, who was also so mentioned in James' EEOC complaint just months before, wrote a letter to Executive Director at Harborview Medical Center, Paul Hayes, recommending James' dismissal from the program.The reason for recommending his termination was for failing to meet the expectations for professional conduct outlined by his Final Counseling Action Plan Specifically, Lindner cited points in the Final Counseling Action Plan that emphasized professionalism in James' conduct and in his

verbal, written and non-verbal communications. "The SEIU Local 925 Union Shop Steward that represented James in his resolution with the company, Daniel Bascom raised the issue that "non-verbal" communication was "problematic" as a standard because it is not concrete and can be misinterpreted. Daniel Bascom was one of the few people that James felt truly represented his best interests and believed in his experience and his story. He saw the narrative of discrimination through the patterns in which Human Resources and other workplace conflict resolution offices not only ignored James' complaints and shrugged off accountability, but then also "ALLOWED AND IN SOME WAYS PROMOTED RETALIATION AGAINST JAMES".

Bascom intended to see James' case through to the end, until true accountability was had and the injustices against James were acknowledged. However, before a conclusion to James' case was reached, Bascom was offered a position by the same organization that he was representing James against, the University of Washington. It was a similar position to what Bascom had applied for months before and so it was difficult for him to turn down. When Bascom asked the university if he could still represent James in his case, he was told "no."

James felt that the next  SEIU 925 union representative he was given, Anjulie Knowles, was not as interested in making the best effort to represent him. He said at times, he even questioned her integrity as he asked her to take actions in the case that she would not do for him, like openly address "THE BLATANT RACSIAM". The other point raised during James' dismissal was that James often writes emails with some phrases or sentences written in all capital letters. This was an issue raised in James' Final Counseling Action Plan and was written in a way that framed James' use of all capital letters as angry or yelling.

For James, using capital letters was not only a way to emphasize a point, but with a blind left eye, it helped him see what he was writing. When he first began working at Harborview Medical Center, he wrote to his peers explaining that his use of capital letters did not indicate that he meant to yell. "When I learned to write on a typewriter, I never learned that all caps meant you were yelling," James said. James educational background was much different than many of the social workers and medical experts he worked alongside. Some of James' more supportive coworkers understood this and found the issue of his use of capital letters to be more or less arbitrary in terms of true professionalism. "You might have your APA style when you wrote to get your master's [degree], this is my style," a co-worker remembers him saying. One coworker and Kristi Dore who were both social workers that worked closely with James noticed the discrimination against him. They even advocated on his behalf to their supervisors and human resources. One spoke on James' behalf to her supervisor Emily Puma for a year before she turned to Human Resources only to be ignored. "SHE EVENTUALLY LEFT THE PROGRAM BECAUSE OF THE TOXIC WORK ENVIRONMENT". "SHE SAID  SHE STRUGGLED WITH HER OWN MENTAL HEALTH MONTHS AFTER WORKING  THERE".

Even though both of these coworkers of James' noted his professionalism, integrity and compassion he exemplified through his work to help others, James' professionalism was frequently questioned by his superiors and human resources. James' background, the way he spoke, the way he wrote emails were constantly being used against him, despite the effectiveness he displayed in his role and the impact he was having on people's lives. He helped roughly 30 people not only get into housing but to be self-dependent in less than a year. "HIS SPECIALTY WAS WORKING WITH THE CLIENTS THAT QUITE HONESTLY OTHERS WERE SCARED OF", said Dore.

During one incident, a problematic client that often engaged in altercations with staff had a

verbal outburst, likely tied to a mental breakdown, in which he threatened a female staff member with sexual assault. All the staff members who witnessed this were shocked and disgusted by what was said. For a moment, no one knew how to react or what to do with this potentially violent client. In an attempt to safely de-escalate the situation, James did what no one else there would do and approached the man and offered him a cigarette. "C'mon man, let's go smoke outside," James calmly said, and escorted the man outside to gather his head and emotions. This is what was unique about the way in which James approached his job. Multiple HR documents show reports of James being called a "pimp" pejoratively behind his back. Dore said he often wore very nice suits to work, something many coworkers noted. Dore remembers when she first began working with James, a different coworker, Thai Nygen, led her to see James' desk when he wasn't there and to make a spectacle of the religious scriptures and references he kept on it, "ALMOST AS IF TO SAY, LOOK AT THIS MONSTER", she said. As she became closer to James, she was cornered by Lisa Lovejoy and asked questions like "why do you like James?". She reported to HR that Lovejoy told her not to look through "rose-colored glasses" when it came to her working relationship with James. Dore wondered if James' did not fit into an idea of what professionalism is because that idea was viewed through a racialized idea of what a professional should be. Dore elaborated on the passion that James would speak with when he communicated with coworkers and clients. At times, some employees complained about the volume at which he spoke or his willingness to do so. She said James was not one to blindly follow orders, because he believed in standing up for what was right. Even in his eccentricity, James' effectiveness in his role seemed to be tangible, and the claims made against his professionalism seemed to be far less so. On March 20, 2019, multiple documents indicated that during a meeting Director of Behavioral Health at UW Medicine, Briggite Folz, made the comment: "That's why White people are in the position that they're in, Black people don't know how to be on time to meeting, unlike White perfectionism."This incident was mentioned in James' federal EEOC complaint against Harborview Medical Center.UW's Title IX Investigator, Kati Lappi, responded to this point calling it "unrelated," to the discrimination complaint. She also attempted to clarify that when Folz was interviewed she said that while she did say "this might be a reflection of White perfectionism" during the meeting, it was "concluded" that she did not state that "that's why White people are in the position they are in," or that "Black people don't know how to be on time. Lappi added that a UW investigator, Jon Payne did admit that Folz comments were "informed by bias," but that there was no "tangible employment action" to be taken and that no hostile work environment was created by the comments. Folz's apology email to Harborview staff was regarded as part of a sufficient resolution to the issue. James regards this response as just one of many examples of how university representatives will acknowledge that an action was based in or informed by bias, but will not acknowledge the harm it did to subtly avoid accountability in a way that the system allows. He said it is the details of these agressions that matter in terms of identifying racially-biased or in some cases blatantly violent behavior, yet it is the details that are avoided, omitted, or tip-toed around in these documents. The nuanced language refuses to admit when bias is present, even when multiple employees have corroborated and reported that it does. "Anytime they got caught saying something racist, it was called an isolated incident," James said.

For James and his peers "THIS WAS A HURTFUL AND ABUSIVE PATTERN OF LIES THAT ONLY SERVED TO PROTECT THE INSTITUTION".

On Sept. 9, 2019, UW Human Resources representative, Nola Balch, offered James a settlement worth one-half his yearly salary under the conditions that he releases his grievance claims as well as his complaint with the U.S. Equal Employment Opportunity

Commission.The EEOC discrimination complaint that James had filed directly named Lisa Lovejoy, peer coordinator for the HARPS program, Martha Lindner, manager of the HARPS program and Brigitte, director of human resources, among others for either their discriminatory behavior or their complicity in allowing it to happen. James said when he declined this offer he was offered two more settlements, each one larger than the next. As a survivor of violence and abuse through both his juvenile and adult life, safety was important to James. He felt like both he and his co-workers deserved to work in a safe environment free from discrimination, harrassment and hostility. An expectation that would be reasonable in any workplace and of any employee. When James Encinas felt like he was being discriminated against in his workplace he reported it to the human resources department. When he was worried about the safety of himself or his co-workers, or even his clients, he reported it to human resources and the other departments dedicated to employee protections. He used every system of justice and accountability available to him, even the ones that were outside of the workplace. However, those would not provide him with justice either.

## A HATE CRIME SHRUGGED OFF BY THE SYSTEM

James often felt like the cards were stacked against him, and he had good reason to feel that way, Victimized so many times in his life by his abusers and the systems that failed to hold them accountable. Now, bullied by co-workers, supervisors, and clients, he would be gaslighted once again.
On July 25, 2019, James was assaulted by a White client who had been confrontational with staff before. "WHILE THE ASSAULT OCCURRED IN FRONT OF OTHER STAFF,  RACIALLY-MOTIVATED HATE SPEECH WAS USED".
After a previous altercation with staff, the client saw James on the street outside the medical facility and began to approach him in an intimidating way. "ACCORDING TO A POLICE REPORT FROM THE INCIDENT", the client began using hate speech and making verbal threats towards James, calling him a "NIGGER," and that "NOBODY LIKES NIGGERS". "OTHER EMPLOYEES ALSO CORROBORATED THAT HATE SPEECH WAS USED WHEN THEY WROTE TO HUMAN RESOURCES".
An employee who witnessed the incident made a written testimony to human resources stating that she heard the client say something along the lines of "STAFF MEMBERS TOLD ME   YOU'RE GOING TO LOSE YOUR JOB", This statement deeply troubled James, as it made him feel like once again, his peers were bad-mouthing him behind his back and that they may be colluding against him.Then the client threw an apple like a baseball at James, missing and striking a passerby.
Seeing as though the incident involved an assault in which racially-motivated hate speech was used James felt like he was a victim of a hate crime and he wanted not only support from his peers and supervisors but also from the justice system. Even though James felt that he had been a direct victim of what he thought should have been defined as a hate crime, the client who assaulted him would be offered a plea deal, reducing his charges to a telephone harassment misdemeanor.The man incurred these charges because he had previously left harassing and intimidating voicemails messages not only to James but to other staff as well. James said this client often lashed out when healthcare providers did not give him what he wanted, be it certain kinds of medications or benefits. James was troubled by the fact that he felt he had been violently victimized once again, and that his abuser would virtually be let off the hook. He contacted both the Seattle city attorney's office as well as the defense attorney, communicating that as a victim he was uncomfortable with the terms of the plea deal, and that he was frustrated that he had not been contacted nor

consulted about the terms of the plea deal. Because the plea deal would reduce the charges to a misdemeanor, the case was passed down to a prosecutor who deals with misdemeanors. James contacted this lawyer too, voicing his protest of the plea. James said the prosecutor admitted that James had been "screwed" by the process and encouraged James to come to the plea hearing and to advocate for himself to the court.

That is what James did.

On August 11, 2021, James came to Seattle Municipal Court to speak on his own behalf about how the plea deal made with his abuser made him feel unsafe as a victim.

James entered the courtroom around 9am that morning. The court was set to hear a series of misdemeanor plea deals. When he entered a mostly empty courtroom he was told to sign-in as a defendant, that which he was not. The courts had shifted to a virtual format amid the pandemic so the prosecutors and most of the defendants were present via a large Zoom conference call. A few defendants were in the courtroom to make their plea in-person, James was likely the only victim that appeared in the courtroom to make a statement that morning. After explaining to a court clerk who he was and what he was there to do, the prosecutor was made aware of his presence in the court. James sat through the plea and sentencing of several cases before his own. Each time, after the defendant pled guilty, a clerk would emphasize the terms and conditions of probation for the record. Eventually, James' case came up. The judge, who had been notified of James' presence, told James that he would have a chance to speak and make a victim impact statement after the defendant's plea. James responded, explaining that his objection was to the plea deal itself. The judge reiterated that he would have a chance to speak and proceeded by explaining to the defendant the terms of the plea negotiation. The former client of Harborview Behavioral Health eagerly pled guilty to the misdemeanor phone harassment charge. Before the sentencing the judge notified James that this would be the time he would be allowed to make his victim impact statement, despite the fact that the plea deal had basically already been completed. James articulated his concerns and displeasure with the way in which the plea deal had been made without his own consultation as a victim, he explained that he had been in contact with both lawyers for months, expressing these exact concerns. The prosecutor chimed in, explaining that certain pieces of evidence and key witnesses were unavailable to the prosecution, making conviction of a hate crime assault difficult. "We were not familiar with those reports," the prosecutor told James when he reiterated his experience as a victim to the court.

James did not believe it.

The judge politely explained to James that if he was unhappy with the prosecution, he had every right to contact the city attorney's office. The prosecutor chimed in again, dismissively explaining to the court that James had already been in contact with their office. James became flustered in the courtroom, he voiced his displeasure with the court. The judge cut him off and explained that the court was going to proceed.

Before the sentencing, the judge allowed the defendant to make a statement, typically reserved for the defendant to express remorse or make an apology to the victim. Instead, "THE MAN SPOKE ABOUT JAMES' FIRING, ATTACKING HIS CHARACTER", leaving James to wonder how he even knew he was fired, or why a patient at the clinic would know so much about a social worker's employment in the first place.

The sentencing proceeded, it was the first case all morning in which the terms of probation were not explicitly stated for the record, allowing James to wonder if his violent abuser got off without any probation at all. The judge began to walk out of the courtroom. James stood up in protest, asking where he could go to receive the record of what happened in court. As he walked towards an exit door behind the judge's bench, the judge looked over at James. James stood there in front of the court with a worryful expression on his face. The

judge turned his head and walked out without acknowledging the man who once again felt like justice had escaped him.

SOBRIETY AT STAKE

James had been driven in his efforts for accountability. He had used every avenue available to him when he was employed at Harborview and even after his employment. Every step of the way he kept records documenting his efforts and communications with agents that belonged to systems which were designed to uphold justice, accountability and protection for people like himself who had been victimized by their employer, their peers and even the clients they pledged to help. He stood distraught outside the Seattle municipal courtroom which he had just watched the man who he wholeheartedly believed had committed a violent hate crime against him walk away with little repercussions from the judicial system."I'M HURT", "I'M SCARED" and "I'M CONFUSED", James told the court as he advocated for himself.The stress of being denied accountability over and over weighs heavy on James."THESE ARE THE THINGS THAT PUT MY SOBRIETY AT RISK", James said after leaving the courtroom that day.

As his efforts continue to be shrugged off by the systems he should be able to rely on, he continues to lose trust, but still takes steps to ensure that he feels protected. He keeps a laminated set of documents that include his driver's license, his insurance, and his diploma. All items that he believes will speak to his credibility and legitimacy as a civilian if ever pulled over by the police. These are all items he hopes might save his life from what he fears could be a racially profiled stop, "WHEN I HAND THIS OVER, IT'S IN GOD'S HANDS", James said of the laminated packet. James' life is often centered around faith, though he does not necessarily trust in the institutions of organized religion. James' preparation and focus on documentation is one that is a survival tactic. Born out of bearing abuse from a young age and then continued in his adult life, it is something he does to protect both himself physically, as well as psychologically. As a child, when James tried to blow the whistle on his abuser, he was ignored and made to look like a liar by people in his own family. The lie he said hurt worse than the abuse itself. Through this experience and others he is familiar with the strategy of gaslighting as a way to dodge the accountability and the shame of having others know what you have done. He likens the gaslighting he endured as a juvenile victim of abuse to the gaslighting he endured from the administrators and supervisors at Harborview and UW Medicine."The ability to address the details is rooted in trauma," James said of efforts to avoid the gaslighting and truth-bending tactics used by abusers and victimizers. He knows how important the details can be in representing what really transpired and how details can be ignored, distorted or minimized to avoid shame and accountability. Through it all, James said. "THEY NEVER EXPECTED ME TO MAINTAIN MY INTEGRITY AND TO DOCUMENT IT"...





9:16   5G

Q Search

**James Encinas**
Just now · 🌐

EEOC Form 161-B (11/16)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

**DISMISSAL AND NOTICE OF RIGHTS**

To: James J. Encinas
2202 O Street N.E.
Apartment B
Auburn, WA 98002

From: Seattle Field Office
909 First Avenue
Suite 400
Seattle, WA 98104-1061

☐ On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 551-2019-02765 | Elizabeth Kidd, Investigator | (206) 220-6886 |

THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☒ The EEOC issues the following determination. Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other (briefly state)

- NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit must be filed **WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.

On behalf of the Commission

Enclosures(s)                    Nancy A. Sienko, Director          8/17/20 (Date Mailed)

cc:   Kati Q. Lappi
Investigation Specialist
UCIRO
4311 11th Ave NE
Suite 220
Seattle, WA 98105

👍 Like      💬 Comment      ↪ Share

**James Encinas**
1d · 🌐

||| ◯ ‹